## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

PLUMBERS AND PIPEFITTERS LOCAL 572
HEALTH AND WELFARE FUND, individually
and on behalf of all others similarly situated,

     Plaintiff,

v.

NOVARTIS PHARMACEUTICALS CORP.,

     Defendant.

Civil Action No.:_____

## CLASS ACTION COMPLAINT
## AND JURY DEMAND

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     PARTIES ................................................................................................................3

III.    STANDING .............................................................................................................4

IV.     JURISDICTION AND VENUE ..............................................................................5

V.      FACTS ....................................................................................................................5

        A.      Branded drug manufacturers have attacked the private prescription drug co-
                pay system. .................................................................................................5

        B.      Cost sharing is critical to the effective functioning of health care in the
                United States. .............................................................................................9

        C.      The routine waiver of cost-sharing obligations, including co-payments and
                co-insurance, for medical services and products is unlawful. ...............10

        D.      Health benefit providers use cost sharing to cope with ever-increasing
                prescription drug costs. ...........................................................................13

                1.      Public and private health benefit providers use tiered cost sharing to
                        reduce spending on prescription drugs. .......................................14

                2.      Branded drugs are expensive; differentiated cost sharing for
                        branded and generic drugs helps health benefit providers and health
                        plan members curtail prescription drug spending. ......................17

        E.      Co-pay subsidies work: health plan members fill prescriptions for branded
                drugs instead of generics and health benefit providers pay much higher
                prices for the subsidized prescriptions. ..................................................18

        F.      Defendant Novartis subsidized health plan members' co-pays for Diovan
                and Diovan HCT. .....................................................................................21

                1.      Novartis faced substitution competition from less expensive
                        therapeutic alternatives after the launch of Diovan. ...................21

                2.      In the wake of substitution competition from less expensive
                        therapeutic alternatives, Novartis created the Diovan and Diovan
                        HCT Prescription Savings Card. ..................................................22

                3.      The Diovan and Diovan HCT Prescription Savings Card
                        specifically provides that it does not apply to Medicare or Medicaid
                        patients or to residents of Massachusetts. ...................................24

                4.      The Diovan and Diovan HCT Prescription Savings Card functions
                        as an unlawful form of secondary health insurance. ...................24

G.  Defendant Novartis hired PSKW and Emdeon to administer its co-pay
subsidy program. ........................................................................................... 26

1.  PSKW and Emdeon currently administer the Diovan/Diovan HCT
co-pay subsidy program for Novartis. ....................................................... 27

H.  Health benefit providers do not know, and cannot know, when defendant
subsidizes its members' co-pays. ................................................................ 31

I.  Defendant's co-pay subsidy program intentionally interferes with the
relationship between health benefit providers and their members ......................... 31

J.  Defendant's co-pay subsidy program involves misrepresentations sent via
mail and the wires. ..................................................................................... 33

1.  Defendant could not run its program without using the mail and
wires. ....................................................................................................... 33

2.  Defendant conveys two distinct misrepresentations via the mail and
wires. ....................................................................................................... 34

VI.  CLASS ALLEGATIONS .................................................................................... 34

VII.  CAUSES OF ACTION ....................................................................................... 38

VIII.  DEMAND FOR JUDGMENT .............................................................................. 48

IX.  JURY DEMAND ................................................................................................. 48

## I.    INTRODUCTION

1.    Plaintiff Plumbers and Pipefitters Local 572 Health and Welfare Fund brings this proposed class action against defendant Novartis Pharmaceuticals Corp. for its unlawful prescription co-payment ("co-pay") subsidy program. Defendant has paid, and continues to pay, undisclosed kickbacks to privately-insured individuals so that those health plan members choose defendant's branded drugs, Diovan and Diovan HCT, instead of less-expensive therapeutic alternatives. Defendant knowingly caused health benefit providers to pay for more prescriptions of these drugs than they otherwise would have, and caused falsely-inflated drug reimbursement rates to be reported to, and imposed on, the members' health benefit providers for these subsidized prescriptions.

2.    Cost-sharing provisions in prescription drug benefit plans unite the financial interests of the health insurer with the interests of its beneficiaries. Requiring health plan members to pay a small portion of the high cost of a branded prescription drug — either a co-pay or co-insurance — provides a reasonable, personal incentive for privately-insured individuals to choose less-costly, usually generic, medications, and drives down the cost of the much larger residual portion paid by the health benefit providers.

3.    In response to cost-sharing provisions, defendant began subsidizing members' co-payments for its key brand name prescription drugs. These subsidies are designed to undermine cost-sharing arrangements. By eliminating or reducing member co-pays for branded drugs, plan members have no incentive to use less-expensive generic drugs, and health benefit providers end up paying for more costly branded drugs. A recent study estimated that these kickbacks will increase health benefit providers' prescription drug costs by *$32 billion* over the next ten years.

4.    Each co-pay subsidy program is one size fits all, involving a formulaic, rote discount that applies regardless of the details of the patient's cost-sharing arrangements.

1

Presenting a co-pay subsidy card to a pharmacist triggers a secondary form of insurance —
provided by the manufacturer — that functionally reduces the price of the drug without
disclosing that price reduction to the insurer. Each and every subsidy is calculated and processed
electronically; the health benefit plans receive electronic records falsely indicating that the
members paid their personal cost-share obligations, yet the manufacturer's digital paper trail
discloses the truth — that the copayments were subsidized by the manufacturer.

5.      Plumbers and the proposed class allege two bases for defendant's liability. First,
federal racketeering law prohibits this form of insurance fraud. Through agreements with
servicing companies, Novartis's routine waiver of co-payments means that the true costs for
reimbursement of the routinely subsidized drug are less than represented by the drug
manufacturer and pharmacy, and thus the amount of reimbursement imposed on the health
benefit plan is inflated. The brand name defendant commits this fraud through its service
provider, and the fraud is accomplished through the use of United States mail and wires. This
suit seeks damages under 18 U.S.C. § 1964(c) for violations of the Racketeer Influenced and
Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 (c) and (d).

6.      Second, federal antitrust law prohibits this form of commercial bribery. Under
Section 2(c) of the Robinson-Patman Act, a seller cannot lawfully pay undisclosed kickbacks to
someone who makes a decision to purchase a product that is paid for by another. 15 U.S.C. §
13(c). Defendant subsidizes members' co-pays to induce them to purchase defendant's branded
drugs instead of less-expensive therapeutic alternatives; health benefit providers then pay for the
much more expensive branded drugs. Consumers who use defendant's co-pay savings cards or
coupons are not told that their insurers are paying much more for defendant's brand-name drugs.

2

7.     This suit seeks damages on behalf of a class of private health benefit providers under Section 4 of the Clayton Act (15 U.S.C. § 15) for overpayments caused by defendant's undisclosed kickbacks.

## II.    PARTIES

8.     Plaintiff Plumbers and Pipefitters Local 572 Health and Welfare Fund ("Plumbers") is a trust fund administered pursuant to the requirements of the Taft-Hartley Act, 29 U.S.C. § 186, by an equal number of trustees appointed by labor and union representatives. Plumbers is an "employee welfare benefit plan" and "employee benefit plan" maintained pursuant to Section 302(c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c)(5), and is defined by Sections 1002(l) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* As such, Plumbers is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d). Plumbers' office is located in Davidson County, Tennessee. During the course of defendant's subsidy scheme, Plumbers paid for much more expensive brand name drugs in circumstances where its members' cost-sharing obligations were not paid by them personally but were subsidized by defendant. As a result of defendant's illegal subsidies, Plumbers purchased more of defendant's expensive brand name drugs than it otherwise would have. Plumbers was injured as a result of defendant's unlawful conduct.

9.     Defendant Novartis Pharmaceuticals Corp. ("Novartis") is a corporation organized and existing under the laws of the State of Delaware whose principal place of business is 59 Route 10, East Hanover, New Jersey. Novartis markets the branded drugs Diovan and Diovan HCT. From in or around 2007 through the present, Novartis subsidized plan members co-pays in order to increase the number of Diovan and Diovan HCT prescriptions purchased by health benefit providers.

3

10.     PSKW LLC, located at 1 Crossroads Drive, Third Floor in Bedminster, New

Jersey, administers the co-pay subsidy program for Diovan and Diovan HCT, both marketed by

Novartis. PSKW claims to have "invented and built the copay card industry," and now "works

side by side with biopharmaceutical marketers to help build loyalty to their brands." In part,

PSKW does this by offering "a full range of CoPay assistance . . . for use through retail

pharmacies," including automatic point of sale couponing, described as follows:

> [F]or those brands that want to automatically apply a CoPay
> reduction for their patient population, we provide vouchers on
> demand – a CoPay reduction service provided at retail to each and
> every filled subscription. This provides the manufacturer with
> another vehicle and venue to reach the patient with a CoPay
> assistance offer, just in case the patient has not received an offer
> through their physician. Being able to reach the patient at the point
> of sale could be a critical time if there is a chance that the cost of
> filling the prescription is too high or if the patient is comparing the
> brand name option vs. a generic alternative.

PSKW is *not* named as a defendant in this action but is an unnamed co-conspirator.

11.     Emdeon, located at 3055 Lebanon Pike, Suite 1000 in Nashville, Tennessee, is a

provider of revenue and payment cycle management and clinical information exchange solutions,

connecting payers, providers, and patients in the U.S. healthcare system. Emdeon's offerings

integrate and automate the business and administrative functions of its payer and provider

customers throughout the patient encounter. Emdeon claims that, through the use of its services,

"which are designed to easily integrate with existing technology infrastructures, customers are

able to improve efficiency, reduce costs, increase cash flow and more efficiently manage the

complex revenue and payment cycle and clinical information exchange processes." Emdeon is

*not* named as a defendant in this action but is an unnamed co-conspirator.

### III.     STANDING

12.     Plumbers has standing to bring this lawsuit for three independent reasons.

4

13.     First, during the relevant time periods, Plumbers paid for prescriptions of Diovan and/or Diovan HCT in circumstances where the defendant's co-pay subsidy was not reflected in the overall reimbursement amount charged by the pharmacy and paid by Plumbers.

14.     Second, during the relevant time periods, Plumbers paid for prescriptions of Diovan and/or Diovan HCT where the member's co-pay was subsidized by defendant.

15.     Third, during the relevant time periods, Plumbers paid for prescriptions of Diovan and/or Diovan HCT that, but for defendant's co-pay subsidies, would have otherwise been written for and filled with less expensive medications.

## IV.    JURISDICTION AND VENUE

16.     This action arises under section 4 of the federal RICO statute (18 U.S.C. §1964) and under section 2(c) of the Robinson Patman Act (15 U.S.C. §13), a 1936 amendment to the Clayton Act (15 U.S.C. §§ 12-27); the Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 18 U.S.C. § 1964 (RICO), and 15 U.S.C. §15(a) (Robinson-Patman).

17.     The activities of the defendant were within the flow of, were intended to, and did have a substantial effect on interstate commerce of the United States.  Venue, therefore, lies within this District under 28 U.S.C. § 1391.

18.     Venue is also proper under the special venue provisions of the federal racketeering and antitrust laws, 18 U.S.C. § 1965 and 15 U.S.C. §22, as defendant Novartis is headquartered in this district and transact business within this District.

## V.    FACTS

**A.    Branded drug manufacturers have attacked the private prescription drug co-pay system.**

19.     Branded drug manufacturers have attacked the private prescription drug co-pay system by subsidizing plan members' co-pays in order to undermine cost-sharing arrangements

between health benefit providers and those they insure. These co-pay subsidy programs reduce or eliminate individuals' co-pays regardless of their financial need.[1] Whether characterized as coupons, rebates, subsidies, or kickbacks, these payments to plan members interfere with health plans' cost-sharing provisions and intentionally influence prescription drug choices. The programs are designed, quite specifically, to reduce or eliminate privately-insured individuals' personal payment obligations so that they choose the brand name drugs and their health benefit providers foot the bill.

20.     Although co-pay subsidy programs vary as to the drugs covered and the specific amount of the subsidy or rebate, all programs work the same way. Individuals enroll in drug-specific programs online.[2] Individuals provide basic information (name, address, and whether they have private health insurance coverage) and the drug company mails them a wallet-size card that includes instructions to pharmacists regarding how to process covered prescriptions. Some drug companies allow individuals to immediately print cards using their home computers.

21.     Members then present their card at the pharmacy with a prescription, and the pharmacist processes the prescription according to the instructions on the card. The pharmacist enters information into a computerized data management system in order to submit a claim, first keying in the patient's health insurance information in the primary insurance field. Insurance information regarding the transaction for that particular individual and his/her insurer is transmitted back to the pharmacist from the insurance company or its pharmacy benefit manager ("PBM"), including information about the member's co-pay or co-insurance obligation. The pharmacist then enters information from the co-pay card system into the secondary insurer field.

---

[1] Co-pay subsidy programs are, by definition, primarily or exclusively for privately- insured individuals.

[2] In the infancy of these programs, drug companies gave co-pay subsidy cards to doctors and pharmacists, who in turn gave the cards to patients. Some cards are still distributed this way, but most are available online.

6

Information regarding the extent of the co-pay subsidy or rebate is similarly computed, but only after the patient's primary insurance is processed (and billed).

22.     The pharmacist and PBM use the reimbursement benchmark, which the brand name drug company provides to the reporting agency, to calculate the usual charge (*i.e.*, unreduced by the amount of the subsidy) to the health benefit insurer for the procurement of that prescription drug. The pharmacist and PBM do so without advising the insurer that, at the same time, the plan member's personal cost share obligation is being picked up by the drug's manufacturer. As a result, the private health benefit provider pays for the medication at its usual (but in fact now inflated) cost, and it does so without being told that the usual cost-share obligation has not been paid by the enrollee, but rather by the brand manufacturer.

23.     In effect, defendant bribes plan members to choose its branded drugs over less-expensive therapeutic alternatives in order to get the health benefit plan to pay for the bulk of the cost of its more expensive branded drugs. From the member's perspective, the branded drug and therapeutic alternatives cost close to, if not exactly, the same amount. But the price of the health benefit plan's share of the therapeutic alternative with the lower co-pay and the branded drug with the higher co-pay may differ by a factor of ten.

> **An Example:** A brand drug company offers a co-pay card giving privately-insured individuals the opportunity to save up to $25 off their cost share for each prescription filled for a particular, and expensive, medication for chronic illness. The plan member brings the co-pay card to his pharmacy and provides his insurance card and co-pay card to the pharmacist. The pharmacist processes information from the insurance card and transmits it to the PBM. The PBM recognizes the drug as a TIER 3 brand drug for the plan member, and relays a $70 obligation to the insurer and a $30 co-pay oligation to the plan member.
>
> In a separate transaction, the pharmacist processes information from the co-pay savings card or coupon. The co-pay card program administrator recognizes the $30 co-pay and covers $25 thereof, leaving $5 for the plan member to pay out-of-pocket (while the pharmacy charges the remaining $25 to the manufacturer through the co-pay card program administrator). The insurer is required to pay for the branded drug as if it were priced at $100, even though the usual cost for these subsidized transactions is $75, and even though there are equally appropriate, less expensive medications available at prices around 1/3 the cost of the branded drug.

7

24.    By its terms, Novartis's co-pay subsidy program (i)  applies to individuals who are privately insured under a prescription drug plan that requires personal cost sharing by the member for retail prescription drugs such as those covered by the co-pay subsidy program, (ii) undermines the contractual insurance arrangement between the insurer and the insurer's member by reducing or eliminating the personal cost-share feature of the insurance contract, (iii) causes the health benefit provider to pay for more units of expensive co-pay subsidy drugs than it would have if the defendant had not interfered with the parties' performance of the contract, and (iv) increases the overall burden on the plan for providing benefits to its members.

25.    Co-pay subsidy programs are also effectively a form of secondary insurance, whereby defendant agrees to cover a portion of the privately-insured individual's prescription drug expenses.  Prescription drug benefit plans, along with the formularies under which they operate, set forth appropriate balances in coverage terms, means of access, payment obligations and cost-sharing provisions for medications.  Prescription drug insurance contracts — whether they are wholly private plans or plans that are privately administered but publicly subsidized (such as Medicare Part D plans or managed Medicaid drug plans) — are governed by myriad federal and state laws and regulations which ensure that the plans properly balance the availability of prescription drugs and sensible financial terms.  Defendant's co-pay subsidies function as unregulated secondary health insurance that, after payment by the primary insurer, swoop in to relieve the plan member of specifically-designed *personal* financial obligations.  By doing so, defendant's co-pay subsidies fundamentally change the nature of the regulated relationship between health insurers and members.  Although defendant's co-pay subsidies

8

function as a form of secondary insurance, defendant does not comply with the myriad laws governing the provision of health insurance.

**B.**    **Cost sharing is critical to the effective functioning of health care in the United States.**

26.    In most economic systems, the person who *selects* the product or service is also the person who *pays* for the product or service.  Health care is a big, notable exception .  Typically, a physician or other health care provider (in consultation with the patient) *chooses* the medication or medical procedure, the patient *receives* the care or consumes the medication, and a public or private health benefit provider *pays* for the services and medication.  The payer is separated from those who make the purchasing decision.  Without cost-sharing provisions — such as percentage co-insurance or graduated co-pays — those choosing the prescription drugs (the patients in consulation with their physicians) have little or no incentive to choose less costly drugs.

27.    Public and private health insurance relies on cost sharing to re-align the interests of patients, health care providers, and health benefit providers.  Although cost-sharing techniques vary by type and amount, they all have the singular purpose of imposing a personal financial obligation on the covered individual in order to encourage price sensitivity and achieve the range of acceptable balance between coverage and cost.  Insured individuals often face point-of-service charges for medical services and prescription drugs.  These include deductibles (amounts that must be paid before some or all services are covered), co-payments (fixed dollar amounts), and/or co-insurance (a percentage of the charge for services).  Health benefit providers impose different degrees of cost sharing for different services: annual deductibles for medical services, a separate deductible for prescription drugs, hospital and outpatient co-insurance, co-pays for physician office visits, and/or out-of-pocket maximum amounts.

28.     Cost sharing is therefore fundamental to almost all medical spending in the United States. Whether it be for hospital, physician, dental, or other health care provider services, for employer-sponsored or individual plans, for medical procedures, or for prescription drugs, numerous forms of cost sharing are imposed as a critical component of public and private health plans in order to carefully incentivize cost-conscious use of medical services and products while at the same time affording appropriate access to medical care.

**C.     The routine waiver of cost-sharing obligations, including co-payments and co-insurance, for medical services and products is unlawful.**

29.     Recognizing the ubiquity and necessity of cost sharing, federal and state statutes declare the practice of routinely waiving co-payment obligations for medical services and products to be unlawful.

30.     First, routinely waiving co-pays constitutes financial inducements that are deemed illegal kickbacks. The waiver is in effect a form of payment that induces the use of medical services or products offered by the party that routinely waives co-pays. The routine waiver of co-pays amounts to health care fraud and is criminal.[3] In the public arena, physicians, hospitals, and medical products providers who receive payment through Medicare or Medicaid programs and routinely waive co-payments or deductibles may be held in violation of federal and state anti-kickback statutes. The federal anti-kickback statute prohibits the payment of remuneration (any kickback, bribe or rebate) when it is knowingly paid to induce business that will be paid for by a federal health care program.[4] And the routine waiver of co-payments in the Medicare and

---

[3] 18 U.S.C. § 1347: Health care fraud ("Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice to defraud any health care benefit program; or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. . . . [A] person need not have actual knowledge of this section or specific intent to commit a violation of this section."); 18 U.S.C. § 1349: Attempt and conspiracy ("Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense . . . .").

[4] 42 U.S.C. § 1320a-7b(b).

10

Medicaid areas forms the basis for a violation of the False Claims Act and the Civil Monetary Penalties Law.[5]

31.     Second, the routine waiver of co-payments constitutes a form of insurance fraud.[6] When cost sharing is routinely waived, the true acquisition cost for the medical service or product is not the stated or reported price being charged to health benefit providers, but rather the price *after deduction for the routinely waived co-payments*. The unlawfulness of this form of insurance fraud is well-known to physicians of any stripe, hospitals, and other health care providers. Physicians and other providers have been criminally prosecuted for routinely waiving co-payments yet still charging the insurer the inflated, pre-waiver price. The American Medical Association has long issued the following warning: "physicians should be aware that forgiveness or waiver of copayments may violate the policies of some insurers, both public and private. . . . Routine forgiveness or waiver of copayments may constitute fraud under state and federal law."[7]

32.     Third, the terms of Novartis's co-pay subsidy program would violate federal and state anti-kickback statutes. The federal anti-kickback statute (42 U.S.C. § 1320a-7b(b)(2)) provides:

---

[5] *See* 42 U.S.C. § 1320a-7a; 31 U.S.C. § 3729.

[6] *See, e.g., Kennedy v. Connecticut Gen. Life Ins. Co.*, 924 F.2d 698, 699 (7th Cir. Ill. 1991) (appellant was required to collect co-payments from the insured patients if he wished to receive payment under an insurance plan that required co-payments: "Providers of medical care may seek to increase their business by promising to waive . . . co-payments. Patients prefer the lower outlays, but waivers annul the benefits of the co-payment system"); *id.* at 702 ("[a]llowing the provider to 'pay' the co-payment to himself is just another way to describe waiver of co-payments").

[7] American Medical Association Opinion 6.12, issued June 1993, *available at* http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion612.page.

> Whoever knowingly and willfully offers or pays any remuneration
> (including any kickback, bribe, or rebate) directly or indirectly . . .
> to any person to induce such person . . . to purchase . . . any good,
> facility, service, or item for which payment may be made in whole
> or in part under a Federal health care program . . . shall be guilty of
> a felony and upon conviction thereof, shall be fined not more than
> $25,000 or imprisoned for not more than five years, or both.

33.     The Massachusetts False Health Care Claims Act (MASS. GEN. LAWS ch. 175H, §

3) similarly provides:

> [A]ny person who offers or pays any remuneration, including any
> bribe or rebate, directly or indirectly . . . to induce any person to
> purchase . . . any good, facility, service, or item for which payment
> is or may be made in whole or in part by a health care insurer, shall
> be punished by a fine of not more than ten thousand dollars, or by
> imprisonment in a jail or house of correction for not more than two
> and one-half years or in the state prison for not more than five
> years, or by both such fine and imprisonment, and may be held
> liable in a civil action.

34.     Defendant knowingly offers and pays remuneration in the form of co-pay

subsidies to patients in order to induce the members to purchase defendant's brand name drugs.

The federal government has acknowledged that co-pay subsidy programs may well violate the

federal anti-kickback statute.[8]

35.     Novartis knows that subsidizing a co-payment for a drug paid for by the fedral

government or a Massachusetts resident would violate these statutes. Although defendant's

program purports to exclude Medicaid and Medicare recipients and Massachusetts residents in

the fine print, on information and belief, the program has been, and is being, used by persons

who participate in those federal and state programs. For example, many individuals are enrolled

in and receive prescription drugs under Medicare Part D; but because Medicare Part D benefits

---

[8] *See* Publication of OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D
Enrollees, 70 Fed. Reg. 70623, 70624 (Nov. 22, 2005) ("[W]e conclude that pharmaceutical manufacturer PAPs
[Patient Assistance Programs] that subsidize Part D cost-sharing amounts present heightened risks under the anti-
kickback statute.").

are sponsored by private health benefit providers, individuals enrolling in defendant's program may report themselves as privately insured, *not* as Medicare patients. Similarly, many Medicaid patients receive their care through managed Medicaid programs run by private health insurers, not state agencies; again, when enrolling in defendant's co-pay subsidy program, these individuals may report themselves as privately insured simply by clicking the appropriate "no" buttons on defendant's website.

36.     If Medicare's ban on co-pay coupons were not enforced, costs to the Part D program would increase by $18 billion over the period from 2012 to 2021.

37.     Massachusetts is the only state that statutorily bans co-pay coupons for private payers. Were it to repeal that law, a recent study suggests that prescription drug costs for employers and other plan sponsors in Massachusetts would increase by $750 million by 2021. Many states that do not explicitly prohibit these programs will see similar — or even larger — increases. For example, Illinois plans are expected to spend nearly $1.4 billion extra on prescription drug costs as a result of co-pay coupons or programs during that time; Florida, New York, California and Texas will spend an extra $2 billion each in the next decade as a result of the same programs.[9]

**D.      Health benefit providers use cost sharing to cope with ever-increasing prescription drug costs.**

38.     Cost sharing has particular importance in the coverage for prescription drug benefits. In 2000, prescription drug spending in the U.S. exceeded $142 billion. By 2009, spending ballooned to more than $300 billion. This increase in drug spending is in large part due to high and rising prices for the most well-known and most often used brand name drugs. In

---

[9] Visante, "How Copay Coupons Could Raise Prescription Drug Costs By $32 Billion Over the Next Decade", Nov. 2011, *available at* http://www.pcmanet.org/images/stories/uploads/2011/Nov2011/visante%20copay%20coupon%20study.pdf ("Visante Study"), at 13-15..

recent years, the price of the most widely used brand name drugs increased annually at approximately 6% to 9% — two or three times the general rate of inflation.  Each of the drugs at issue in this action has seen significant price increases in recent years.

      **1.**      **Public and private health benefit providers use tiered cost sharing to reduce spending on prescription drugs.**

39.     For both public and private health benefit providers, prescription drug cost sharing is widely and effectively used, and has been for many years.

40.     In the public realm, beneficiaries under Medicaid have, for years, been required to pay a portion of the cost of their medications, despite the fact that Medicaid eligibility is limited to low-income and disabled individuals.  Similarly, even beneficiaries under Medicare Part B — generally the elderly receiving critical physician or in-home services — have been required to share the costs of their medications.  And, more recently, beneficiaries under Medicare Part D are required to make co-payment or co-insurance payments under terms specified by Medicare Part D plan sponsors.

41.     Most health insurance in the United States is provided by private health benefit providers.  In the private realm, cost sharing for prescription drugs is similarly widespread. Under private health insurance plans, individuals and employers pay premiums to health benefit providers and, in turn, the health benefit providers agree to pay all or a portion of the cost of needed medical services and products.[10]  Well over 95% of covered employees in employer-sponsored private health benefit plans have prescription drug benefits.  More often than not, the form of cost sharing is a co-payment rather than co-insurance, although co-insurance has steadily increased over time.

---

[10] In the United States, most private health insurance is paid at least in part by employers, although it is also common for employees to contribute to the cost of their premiums.  Truly individual health insurance policies may also be purchased.

42.     Drug benefit cost-sharing provisions have evolved over the decades, with the key innovation being the differentiation of co-payments among differing drugs.  When drug insurance was first introduced, the plan member typically paid the same co-insurance (or co-pay) rate for any drug.  Over time, that changed, and the price now depends on the "tier" in which the drug is placed.  The early tiered plans typically had only two tiers, but most plans now have three or more tiers.  In recent years, an increasing number of plans have created a fourth tier of drug cost sharing, which may be used for lifestyle drugs or expensive biologics:

---

**Generic drugs:** A drug product that is no longer covered by patent protection and thus may be produced and/or distributed by multiple drug companies.

**Preferred drugs:** Drugs included on a formulary or preferred drug list; for example, a brand name drug without a generic substitute.

**Non-preferred drugs:** Drugs not included on a formulary or preferred drug list; for example, a brand name drug with a generic substitute.

**Fourth-tier drugs:** New types of cost-sharing arrangements that typically build additional layers of higher co-payments or co-insurance for specifically identified types of drugs, such as lifestyle drugs or biologics.

**Brand name drugs:** Generally, a drug product that is covered by a patent and is thus manufactured and sold exclusively by one firm.  Cross-licensing occasionally occurs, which allows an additional firm to market the drug.  After the patent expires, multiple firms can produce the drug product, but the brand name or trademark remains with the original manufacturer's product.

---

43.     The number of plans requiring some form of cost sharing that differentiates between forms of drugs has steadily increased, but has plateaued in recent years.  Almost 90% of privately-insured individuals have some formula for tiered cost sharing; over 75% are enrolled in plans with three, four, or more tiers of cost sharing for prescription drugs.

44.     A drug's tier placement largely depends on its cost: Tier 1 drugs are less expensive, usually generic, drugs.  More expensive, usually brand name, drugs are placed on higher tiers.  Health benefit providers encourage members to choose Tier 1 drugs by imposing a

lesser co-pay than that imposed for Tier 2 drugs. Tiered co-payments and co-insurance (which is a percentage of the overall cost of the drug at retail) thereby provide reasonable personal financial incentives to individuals to use equally effective, but less costly, medications. If a drug is placed on Tier 1, the member pays the pharmacy a relatively small co-payment. If the drug is placed on Tier 2, the co-payment or coinsurance obligation increases. The difference in the co-payment/coinsurance between Tier 2 and Tier 1 incentivizes the plan member to choose the less costly medication. If a drug is a Tier 3 drug, a therapeutic or generic equivalent will invariably exist for the medication in Tier 2 and/or Tier 1.

45.     Another major, long-term trend has been the increasing *amount* of the co-payment or co-insurance required. Over the last decade, average retail co-payment levels increased by about 62%. Average co-payments for Tier 2 drugs increased by about 127%. Average co-payments for Tier 3 drugs increased the most, from about $17.53 in 1998 to about $42.95 in 2009, an increase of about 149%. As expected, the 2009 average retail co-payment for Tier 4 drugs is even greater, at $62.11.

46.     Widespread use of cost sharing for prescription drugs, the increasing trend of multi-tier cost sharing and the increasing amounts for co-payments and co-insurance are, of course, no accident. Although other forms of prescription drug cost reductions may have more dramatic results — including the market entry of AB-rated generic equivalents — cost sharing has defined, measurable results. Cost sharing provides personal financial incentives to plan members to select the most cost-appropriate medications; these incentives work.

47.     Patients — and to a lesser extent, their doctors — are sensitive to differences in co-payment requirements, particularly for maintenance drugs that they anticipate taking for long or indefinite periods of time. According to a 2007 literature review published in the Journal of

the American Medical Association, *every 10% increase in cost sharing (through co-payments or co-insurance) reduces drug spending by 2 - 6%.*[11] And drug companies are well aware that plan members consider co-pay differences when choosing prescription drugs: "[t]he patient, I will tell you, is economically very, very sensitive to co-pays, and a $5, $10, $20, $25 co-pay matters," says Abbott Laboratories Chief Executive Miles White.[12]

### 2. Branded drugs are expensive; differentiated cost sharing for branded and generic drugs helps health benefit providers and health plan members curtail prescription drug spending.

48. Generic drugs thus play a critical role in health benefit providers' attempts to curb ever-escalating prescription drug costs. Generic drugs are almost always significantly less expensive than their branded counterparts. On average, generic prescriptions cost payers $16, preferred brand prescriptions cost $118, and non-preferred brands cost $124. Tiered cost-sharing provisions thus incentivize generics by imposing a lower co-pay or co-insurance for generics than for brands.

49. AB-rated generics are, by definition, substitutable for their branded equivalents. All fifty states have laws that permit pharmacies to substitute AB-rated generics for their branded counterparts when an AB-rated equivalent is available. Health benefit providers create strong incentives for plan members to demand generic drugs by imposing different co-pays for branded and generic drugs. Consequently, more than 90% of prescriptions for drugs that are available in both branded and generic forms are filled with a generic. 2010 IMS industry data — the industry's gold standard — reflects that, on average, AB-rated generics capture 80% of the brand's sales within the first six months.

---

[11] *Id.*

[12] Event Brief of Q2 2009 Abbott Earnings Conference Call – Final, FD (Fair Disclosure) Wire (July 15, 2009).

50.     In addition to AB-rated generics, a brand name drug may also have generic therapeutic alternatives. Therapeutic alternatives are *not* bioequivalent to their brand-name counterparts, but are alternative medicines that treat the same medical condition in a similar way. As an example, Pfizer's blockbuster drug Lipitor belongs to a therapeutic class of drugs called "statins" used to treat high cholesterol. But because statins work in similar ways, a patient and/or physician may determine that another statin, such as generic simvastatin, lovastatin, and pravastatin,, is a sensible, cost-effective alternative s — particularly since (without a co-pay subsidy) the cost to the patient by reason of the tiered co-payment system would be much higher for Lipitor than for a generic statin.

**E.     Co-pay subsidies work: health plan members fill prescriptions for branded drugs instead of generics and health benefit providers pay much higher prices for the subsidized prescriptions.**

51.     These kickbacks work. According to a 2011 study undertaken for the Pharmaceutical Care Management Association and based on evidence from drug coupon administrators, "25% of [co-pay] coupon use results in a couponed drug being used instead of a preferred brand or generic that might have been used in the absence of the coupon."[13] More than 100 million prescriptions were associated with co-pay coupons in 2010, accounting for 11% of brand prescriptions.[14] These numbers will grow exponentially: At current trends, the number of prescriptions associated with co-pay subsidy programs will increase by 15% per year, reaching 500 million prescriptions and approximately 50% of non-specialty brand prescriptions by 2021.[15]

---

[13] Visante Study, at 11.

[14] *Id.* at 12.

[15] *Id.*

18

All told, employers and other plan sponsors will likely spend an extra $32 billion on prescription drugs as a result of these co-pay subsidy programs over the next decade.[16]

52.     It is estimated that pharmaceutical companies spend $4 billion on co-pay cards and coupons annually.[17] Drug manufacturer Amgen has stated publicly that spending on its co-pay subsidy programs amounts to about *1% of its total product sales*; in the first quarter of 2010, Amgen spent $35 million on co-pay subsidy programs. This amount is likely to increase as more co-pay programs are created and more plan members take advantage of existing programs.

53.     Brand-name pharmaceutical manufacturers know that these co-pay subsidy programs work: these programs are now a regular part of life cycle planning for branded drugs, typically launching two to three years before AB-rated generic equivalents of the brand name drug are expected to enter the market. The manufacturer tries to maximize the number of prescriptions written by physicians, filled by members, and paid for by both members and health benefit providers before pharmacies begin automatically substituting the AB-rated generic equivalents for the brand name drug.

54.     Health benefit providers have seen significant increases in the number of prescriptions filled for brand name drugs that have co-pay subsidy programs. Recently, co-pay subsidy administrators have anecdotally reported that their unnamed clients, manufacturers of branded drugs, earn between a 4:1 and 6:1 return on their investments in these programs.

55.     The attack on the prescription drug co-payment system is open and notorious. Large branded drug companies reflexively subsidize co-payments for many brand name drugs simply because they are nearing patent expiry. Co-payment subsidy administration has become a

---

[16] *Id.* at 3, 13-15.

[17] Matthew Herper, *How Bargain Lipitor Could Raise Health Costs*, FORBES.COM, http://blogs.forbes.com/matthewherper/2011/03/16/how-bargain-lipitor-could-raise-health-costs/ (last visited Mar. 2, 2012) (citing Mason Tenaglia, managing director of the Amundsen Group, a consulting firm that has studied the cards). *See also* Visante Study at 6.

cottage industry. Program administrators boast about the effective and efficient methods by which they have wiped out the personal financial incentives of plan enrollees to select, in consultation with their physicians, less costly medications.

56. Drug companies, including defendant Novartis, not only determine the price at which wholesalers or large retailers will purchase prescription drugs from them, but also control the reimbursement benchmark used to determine the amount to be paid for the drugs by public and private health benefit providers. Either by directly determining the so-called average wholesale price (or "AWP") or by determining a related price benchmark known as the wholesale acquisition price (or "WAC") that reporting agencies use to mathematically determine the AWP, branded drug manufacturers cause to be published the widely-used and nearly ubiquitous benchmark prices for payments and reimbursements that health benefit providers make to pharmacies for branded, retail-channel drug products.

57. Branded drug manufacturers, including defendant, know that the reported benchmark that they control is required to be a reasonably fair estimation of the actual price for the ingredient cost of the drug to the retailer. When a prescription for a privately-insured individual is filled at the retail level (*i.e.*, a pharmacy), the pharmacy charges the member's plan for the ingredient cost of the drug plus a dispensing fee. The amount to be charged for the ingredient cost is based on a percentage discount from the benchmark (*e.g.*, AWP minus 14% for all branded drugs). Thus, the stated benchmark represents the price that all participants — the health benefit provider, its pharmacy benefit manager, the pharmacy and the manufacturer — understand is a reasonable estimate of the actual cost to the pharmacy on which the payer's reimbursement to the pharmacy is based. Of course, if a cost-sharing provision exists for the member's prescription drug plan, then the cost share (*e.g.*, co-payment or co-insurance) is

deducted from the amount owed by the plan to the pharmacy and is imposed on the member as a payment to the pharmacy. However, for subsidized co-pays, the true benchmark is less resulting in an inflated payment by the health insurers.

58.     Routinized co-pay subsidy programs constitute commercial bribery because the programs pay undisclosed kickbacks to plan enrollees to select expensive medications that are paid for by prescription drug benefit providers.

59.     Routinized co-pay subsidy programs constitute insurance fraud because routine waiver of co-payments reduces true acquisition costs, yet drug manufacturers withhold co-payment information, do not decrease the applicable reimbursement benchmark for the drugs, and cause inflated payments to be imposed upon private prescription drug benefit providers.

**F.     Defendant Novartis subsidized health plan members' co-pays for Diovan and Diovan HCT.**

60.     Defendant designed and implemented the program described below (referred to as the "co-pay subsidy program" or the "Diovan/Diovan HCT co-pay subsidy program"), relating to the brand name drugs Diovan and Diovan HCT (collectively, the "co-pay subsidy drugs").

61.     Defendant's co-pay subsidy program described below alters the carefully calibrated co-payment system negotiated by health benefit providers and their members. The program is intended to steer unsuspecting members toward more expensive brand name drugs when less expensive therapeutic alternatives are available in generic form, with generic price tags.

**1.     Novartis faced substitution competition from less expensive therapeutic alternatives after the launch of Diovan.**

62.     On December 23, 1996, the FDA approved Diovan (valsartan), in capsule form, for the treatment of hypertension. On March 6, 1998, the FDA approved Diovan HCT (valsartan and hydrochlorothiazide), in tablet form, for the treatment of hypertension. On July 8, 2001, the

21

FDA approved Diovan tablets for the same indication. The Diovan dosage forms were later approved for the treatment of heart failure.[18] Diovan is an angiotensin receptor blocker ("ARB") that relaxes and widens the blood vessels to reduce high blood pressure. Diovan HCT is a combination of Diovan and a diuretic. AB-rated generic equivalents to Diovan and Diovan HCT will not come to market until at least September 2012. Less expensive therapeutic alternatives to Diovan and Diovan HCT include other ARBs, such as losartan potassium (Cozaar) and losartan potassium with hydrochlorothiazide (Hyzaar); ACE inhibitors, such as lisinopril (Prinivil, Zestril); beta blockers, such as metoprolol tartrate (Lopressor) and atenolol (Tenomin); and calcium channel blockers, such as amlodipine besylate (Norvasc).

63.     In mid-2011, Novartis President Andre Wyss told investors that Diovan was already facing competition: "As you know, Diovan will face loss of exclusivity next year around September, and has already faced, since one year, generic competition. In spite of this, performance has remained very strong."[19]

64.     By third quarter 2011, Novartis was reporting that generic Cozaar was "taking a bigger percentage of the market," but that Diovan was gaining share among the remaining branded ARBs.[20]

### 2.     In the wake of substitution competition from less expensive therapeutic alternatives, Novartis created the Diovan and Diovan HCT Prescription Savings Card.

65.     To combat the substitution competition it was facing from less expensive therapeutic alternatives, in or around 2007, Novartis created the Diovan and Diovan HCT Prescription Savings Card:[21]

---

[18] Diovan capsules were subsequently discontinued.

[19] Novartis AG at Deutsche Bank Securities Inc. Health Care Conference – Final, FD (Fair Disclosure) Wire (May 3, 2011).

[20] Event Brief of Q3 2011 Novartis AG Earnings Conference Call – Final, FD (Fair Disclosure) Wire (Oct. 25, 2011).

  **Diovan Prescription Savings Card Terms & Conditions**

Present your card or voucher and insurance card (if applicable) along with your valid prescription for DIOVAN or DIOVAN HCT to any participating pharmacy. Patient questions should be directed to 1-855-375-7507.

---

**Co-pay Card Terms & Conditions**
**Offer Details:** If you're paying more than $25 a month, you can get automatic savings on your next 12 prescriptions. You pay the first $25 on each prescription and your Savings & Membership Card will cover the next portion, up to $25.

66.     With the card, a plan member paid the first $25 of his or her monthly co-payment, and Novartis paid the rest, up to $25 ($300 per year per plan member).

67.     In or around early 2012, Novartis revised the terms and conditions governing the Diovan and Diovan HCT Prescription Savings Card. Under the new terms and conditions, a card member pays the first $25 of his or her monthly co-payment, and Novartis pays up to the next $145, apparently without any annual limit.[22]

68.     The Diovan and Diovan HCT Patient Savings Card is not a need-based program. It is open to all patients with a prescription for Diovan or Diovan HCT and subsidizes the co-pays of any commercially-insured patients. A patient can sign up for the program and print the Diovan and Diovan HCT Prescription Savings Card online by providing his or her name, address, e-mail address and date of birth and by answering a few short questions on Novartis's website: http://www.diovan.com/info/ways-to-save/diovan-patient-savings.jsp.

69.     Novartis has recently begun to offer visitors to its website a Co-Pay Estimator tool that calculates the estimated out-of-pocket cost to the patient for his or her Diovan or Diovan HCT prescription. All the patient has to do is select a state of residence and insurance plan from a drop-down list and the website generates a purported estimate of the patient's co-pay amount.

---

[21] https://www.diovan.com/info/ways-to-save/diovan-patient-savings.jsp, downloadable file called "termsandconditions.pdf" (Dec. 7, 2011).

[22] https://www.diovan.com/info/ways-to-save/diovan-patient-savings.jsp, downloadable file called Diovan Patient Savings Terms & Conditions.

The source of this data is a company called Fingertip Formulary, which explains on its website

that its "goal is to help pharmaceutical clients understand the managed care landscape and

improve their sales and marketing efforts."[23]

3.    **The Diovan and Diovan HCT Prescription Savings Card specifically provides that it does not apply to Medicare or Medicaid patients or to residents of Massachusetts.**

70.    To register for the Diovan and Diovan HCT Prescription Savings Card, a patient

must first answer the following starred question: "Does any government program (e.g. Medicare

or Medicaid) help to pay for all or part of your prescription cost?"  If a patient answers "no," or

types in a Massachusetts address, a message appears stating that he or she is not eligible for the

program.

71.    The fine print on the bottom of the printed savings card additionally states:

> Not valid for prescriptions for which payment may be made in
> whole or in part under a federal or state health care program,
> including but not limited to Medicare or Medicaid, or for patients
> in MA.

4.    **The Diovan and Diovan HCT Prescription Savings Card functions as an unlawful form of secondary health insurance.**

72.    The fine print on the Diovan and Diovan HCT Prescription Savings Card also

instructs pharmacists to run a patient's primary coverage first and to then submit the balance to a

company called Therapy First Plus as "Other Coverage" by a "Secondary Payer."

> **Pharmacist for a patient with an Authorized Third Party:**
> Submit the claim to the primary Third Party first, then submit the
> balance due to **Therapy First Plus** as a Secondary Payer as a co-
> pay only billing using a valid Other Coverage Code (e.g. 08).  The
> patient pay amount will be reduced by up to $25.00 and
> reimbursement including a handling fee will be received from
> **Therapy First Plus.**

---

[23] www.fingertipformulary.com/About/.

24

**Pharmacist for a patient with Managed Care Restrictions:** If the primary claim submission shows a managed care restriction (step-edit, prior authorization or NDC block), enter Other Coverage Code (OCC) 08 or 03. If a system is unable to process the claim using these coverage codes, or if you have questions regarding processing claims with a managed care restriction, please call 1-800-784-3330.

73.     The Prescription Savings Card functions as a form of secondary insurance.

   **a.     Novartis knows that third party payors cannot tell when a co-pay is subsidized.**

74.     Novartis knows that the co-pay subsidy enterprise that it and its co-pay card administrators have designed makes it impossible for third-party payors to tell if their members' co-pays are being subsidized by co-pay savings cards. Novartis admits as much in the fine print on the back of the Focalin XR Savings Card (issued in connection with one of Novartis's other co-pay subsidy programs), where it attempts to push onto patients the responsibility for making such disclosures: "Patient is responsible for reporting receipt of program rewards to any private insurer that pays for or reimburses any part of the prescription filled with this program."



25

**G.    Defendant Novartis hired PSKW and Emdeon to administer its co-pay subsidy program.**

75.    Novartis depends on cooperation from both pharmacies and program administrators to conduct the co-pay subsidy program. Defendant compensates both pharmacies and the co-pay benefit administrators for their efforts. Defendant and its co-conspirator administrators process co-pay subsidy claims through a "shadow claims system" that hides the subsidies from health benefit providers.

76.    For prescription drugs, plan members present their co-pay cards or coupons along with their health insurance cards (which include the prescription drug plan) at the pharmacy. An individual's primary insurance is processed first, establishing the plan member's co-pay or co-insurance amount[24] and the price of the drug that will be billed to the health benefit provider.

77.    The pharmacist then processes the co-pay card or coupon associated with the co-pay subsidy program. The pharmacist enters into the pharmacy computer information on the co-pay card as though it were a form of secondary insurance. The pharmacist notes the amount of the co-pay that will be subsidized by defendant and conveys that information to a co-pay card program administrator, who reimburses the pharmacy on defendant's behalf.[25] The plan member pays out-of-pocket the difference between his or her co-payment (or co-insurance) and the amount subsidized by defendant. The pharmacist then charges the health benefit provider the full amount of the health benefit provider's usual payment for the branded drug in question, *i.e.*, the health benefit provider pays an amount for the co-pay subsidy drug's purchase as if the plan's member had made full personal payment of his/her cost-sharing obligation.

---

[24] For plan members with a co-insurance responsibility, pharmacists determine the dollar amount to be paid by the member. Sometimes, this amount is referred to, inaccurately, as a "co-pay."

[25] The administrator pays pharmacies for all co-pay subsidies on the manufacturer's behalf every fourteen to twenty-eight days. The manufacturer repays the administrator on a similar schedule.

26

78. During a transaction *without* the use of the unlawful co-pay subsidy, the pharmacy reports data to the health benefit provider (or its PBM) that enables the provider to know the claim, drug dispensed, amount paid by the plan, amount of co-payment/co-insurance paid, and other data. In a transaction *with* the use of the subsidy, *the information transmitted to the health benefit provider does not include any disclosure that a subsidy was paid*; the plan member's cost-sharing obligation is simply reported to the benefit provider as having been paid.

79. As F. Everett Neville, chief trade relations officer at Express Scripts, one of the country's largest PBMs, told the New York Times in January 2011: "[t]he payer doesn't know, and the P.B.M. doesn't know. . . . We have no ability to stop it and no ability to prohibit it."

80. Here, defendant hired unnamed co-conspirators PSKW and Emdeon to administer its co-pay subsidy program.

### 1. PSKW and Emdeon currently administer the Diovan/Diovan HCT co-pay subsidy program for Novartis.

81. On information and belief, PSKW and Emdeon (collectively, the "administrators" and the "unnamed co-conspirators") administer the Diovan/Diovan HCT co-pay subsidy program for Novartis.

82. PSKW and Emdeon are *not* named as defendants in this action but are unnamed co-conspirators for purposes of RICO and antitrust violations.

83. PSKW owns proprietary technology for the processing of co-pay subsidy cards.

84. Emdeon is "a leading technology services provider to retail pharmacy," operating "the second largest retail pharmacy national claims switching network."[26]

---

[26] http://www.emdeon.com/rxmanufacturers/.

85.    On information and belief, Emdeon has partnered with PSKW to perform co-pay adjudications, whereby PSKW's technology is used to initiate the claims process, and claims are then submitted to Emdeon for processing.

        **a.**    **PSKW**

86.    On the home page of its website, PSKW boasts that it "works side by side with biopharmaceutical marketers to help build brand loyalty to their brands.  Our laser focus on building brand loyalty provides our clients with unmatched advantages."[27]

87.    Namely, PSKW tailors programs to build brand loyalty through the use of "CoPay assistance" which "generate[s] better response rates."[28]

88.    One of the programs PSKW touts on its website is its "Automatic Point of Sale Couponing," which it describes as a co-pay subsidy program:

> And for those brands that want to automatically apply a CoPay reduction for their patient population, we provide vouchers on demand – a CoPay reduction service provided at retail to each and every filled subscription. This provides the manufacturer with another vehicle and venue to reach the patient with a CoPay assistance offer, just in case the patient has not received an offer through their physician.  Being able to reach the patient at the point of sale could be a critical time if there is a chance that the cost of filling the prescription is too high or if the patient is comparing the brand name option vs. a generic alternative.[29]

89.    PSKW's focus on generic drugs as alternatives to higher-cost brand name drugs drives most of its innovations.  "[G]iven the rash of patent expirations faced by the pharmaceutical industry, there is a heightened degree of interest in shifting focus from new

---

[27] www.pskw.com.

[28] www.pskw.com/what-we-do/adherence-solutions/.

[29] *Id.*

customers to existing customers — a win-win scenario as both patients and pharmaceutical

companies benefit in multiple ways from greater medication adherence."[30]

90.    "Medication adherence" (or the continued use of a name brand drug when a

generic has entered the market) is accomplished by "leverag[ing] proprietary technology to

provide digital messaging and communication at critical points in a patient's treatment" through

the use of devices like "PSKW's co-pay reduction cards delivered at the point of prescription to

drive initial script fill."[31]

91.    This "proprietary technology" was supplemented with PSKW's purchase of

Touch Tone Media, Inc. ("Touch Tone") in April 2006.

> Touch Tone spent several years and expended substantial amounts
> of money to develop a confidential and proprietary method for
> activating and funding a debit card that could only be used for the
> intended product.  The method that Touch Tone developed
> involved using the pharmacy adjudication process, which is a
> national payor network that links pharmacies and the major payors
> of pharmaceuticals. . . .  This new payment method that Touch
> Tone developed involved linking the national payor network
> described above with the banking industry.[32]

92.    This technology proved to be quite successful in the development of co-pay

subsidy programs, allowing PSKW to "work[] with major pharmaceutical companies, providing

---

[30] Press Release, PSKW, PSKW and HealthPrize Partner to Provide Comprehensive Suite of Medication
Loyalty, Adherence Solutions to Pharmaceutical Companies (June 16, 2011), *available at*
http://www.pskw.com/company-news/june-16-2011/.

[31] *Id.*

[32] *PSKW, LLC v. McKesson Specialty Arizona, Inc.*, No. 602921/07, Second Amended Complaint (Sup. Ct.
N.Y. July 16, 2008).  PKSW is currently suing McKesson Specialty Arizona, Inc. for misappropriating trade secrets
developed by Touch Tone after Touch Tone and McKesson signed a mutual non-disclosure agreement prior to
entering into a partnership to develop a co-pay reimbursement program.  This was prior to PSKW's purchase of
Touch Tone and all of its tangible and intangible assets.

proprietary marketing concepts and technology that enables insured prescription patients to obtain their medications with little or no co-pay costs."[33]

93.    PSKW boasts that its co-pay programs "build brand trial, persistence, and compliance," successfully edging-out competition from generic drugs.

        **b.    Emdeon**

94.    In its promotional materials and on its website, Emdeon states that it is "a leading provider of revenue and payment cycle solutions that connect payers, providers and patients to improve healthcare business processes."

95.    Emdeon claims to operate the second largest retail pharmacy adjudication network in the country. On its website for pharmaceutical manufacturer clients, it states that "[o]ver 20,000 retail pharmacies process third party claims with Emdeon."

96.    Emdeon boasts that it "has been managing clients' coupon voucher programs since 2001" and that it "processes and manages more than one million traditional coupon claims per month, encompassing hundreds of different coupon programs."

97.    "With nationwide pharmacy participation and hundreds of millions of total traditional coupons processed," Emdeon claims to be "the leader for traditional pharmacy coupon/voucher processing."

98.    Therapy First Plus is a type of program that provides patients with an initial free trial, followed by co-pay subsidies, all with the same coupon or card. The Diovan/Diovan HCT Savings Card is one of Emdeon's Therapy First Plus programs.

---

[33] Press Release, PSKW, PSKW Expands its Lawsuit Against McKesson to Seek Assignment of McKesson's Patent Application (Sept. 1, 2011), *available at* http://www2.prnewswire.com/cgi-bin/stories.pl?ACCT=104&STORY=/www/story/09-01-2008/0004876349&EDATE=.

99.     In addition to traditional co-pay coupons and savings cards, Emdeon offers pharmaceutical manufacturers a service called Emdeon Voucher on Demand, an electronic co-pay offset program.

100.     Finally, Emdeon provides comprehensive claims data management and analysis tools with customized reports, dedicated account management and call center support.

**H.     Health benefit providers do not know, and cannot know, when defendant subsidizes its members' co-pays.**

101.     Health benefit providers are generally aware that drug companies offer co-pay subsidy programs. But health benefit providers do not know, and cannot know, which of the prescriptions that they have paid for have been subsidized. Pharmacists process subsidies as instructed by the defendant and its co-conspirator administrators, and they do not tell health benefit providers or PBMs when a prescription has been subsidized. Defendant, however, possesses detailed records of each and every subsidized prescription. The extent of the injury to Plumbers and the class can easily be determined through discovery of defendant's co-pay subsidy program records.

**I.     Defendant's co-pay subsidy program intentionally interferes with the relationship between health benefit providers and their members.**

102.     By providing undisclosed kickbacks to reduce or eliminate the cost-sharing mechanism in thousands of health insurance contracts for widely used maintenance prescription drugs, defendant unfairly undermines health benefit providers' best attempts to control prescription drug costs. Pharmacy and Therapeutics ("P&T") committees arrive at formulary placement decisions after considerable decision-making, in an effort to address overall prescription drug costs as a burden on the delivery of quality health care. Even small co-pay subsidies meddle with the cost share balance so carefully struck by P&T committees in formulary tier structures and cost containment provisions in prescription drug benefit plans.

31

Defendant offers such sweeping bribes that it often effectively reduces the co-pay for branded drugs to *less* than the average co-pay for therapeutic or AB-rated generic alternatives, thereby completely neutralizing health benefit providers' contractual tiered formulary structure.

103.   Defendant intends to interfere with health plans' cost-sharing provisions. Before 2005, drug companies regularly offered patients vouchers or coupons for a free prescription of a particular brand name drug. These coupons curried favor with patients but required the manufacturer to absorb the cost of the entire prescription. According to PSKW, the ability to promote brand loyalty by offering the patient a discount while still having the health benefit provider pay for the majority of the prescription was the key benefit of co-pay card subsidy programs:

> At the first Pfizer meeting, Touch Tone's President gave a presentation with respect to Touch Tone's new method, focusing on the benefits of the method, particularly insofar as its ability to *enable the manufacturer to provide a benefit to the patient*, thereby promoting brand loyalty, *while at the same time incurring the cost **only** of the co-pay reimbursement and **not** of the entire cost of the prescription.* Under the inferior loyalty programs offered by other providers, including defendant, vouchers were provided to the patient, who then received free therapy, *with the resulting loss to the manufacturer of the entire cost of the prescription.*[34]

104.   The co-pay subsidy kickbacks also force other potential short or long-term changes in available prescription drug coverage. Without a means of enabling cost *sharing* (and make no mistake about it, defendant's co-pay subsidy program prevents plans and their members from agreeing to effective sharing programs), plans are left to consider wholesale cost *shifting*, under which the benefit provider pays *none* of the cost of a branded drug, and the member pays *all* of the cost, when alternatives to a branded drug exist. At base, defendant has unfairly,

---

[34] Emphasis added.

deceptively, and improperly interfered with health insurance providers' ability to effectively contract for appropriate cost-sharing provisions in insurance contracts.

105.    Finally, as described above and despite defendant's fine-print disclaimers to the contrary, the co-pay subsidy kickbacks are an unlawful form of secondary health insurance.

**J.    Defendant's co-pay subsidy program involves misrepresentations sent via mail and the wires.**

**1.    Defendant could not run its program without using the mail and wires.**

106.    Defendant makes individuals aware of its co-pay subsidy program through the mail and wires. Defendant advertises its co-pay subsidy program on the Internet, splashing links across websites devoted to its brand name drugs. Defendant advertises its co-pay subsidy program, including the Diovan Prescription Savings Card, in magazines and on network television: as an example, a full-page advertisement appearing in the September 12, 2011 issue of People magazine told readers about the "[e]xceptional patient savings" they could receive, "with up to $60 off every monthly prescription for a full year – up to $720," if they simply downloaded the Focalin XR Savings Card at www.FocalinXR.com.

107.    Defendant has individuals sign up for its program via the wires. Most patients sign up to participate in the program online, filling out information that is transmitted to the defendant via the Internet.

108.    Defendant sends the physical co-pay cards to individuals, doctors, and pharmacies via the mail.

109.    The co-pay subsidy enterprises do, in fact, use the mail and wires to implement this program: . Defendant and its co-conspirators use the wires to have the pharmacy, pursuant to defendant's instruction, contact the administrator about the number of subsidized prescriptions

filled and the amount subsidized for each prescription, and the administrator in turn contacts the manufacturer and communicates the subsidy information to the manufacturer.

110.    Defendant also uses the mail and wires to send money to the administrator, and the administrator sends money to the pharmacy to effectuate reconciliation and reimburse the pharmacy for recognizing the co-pay subsidies.

111.    These communications between pharmacies, the administrators, and the defendant occur tens of thousands of times per year. Defendant and its co-conspirators possess information about the specific dates of transactions, which defendant has withheld from health benefit plans.

    **2.**    **Defendant conveys two distinct misrepresentations via the mail and wires.**

112.    Defendant and its co-conspirators make misrepresentations via the wires at the time of the point of sale transaction — that is, when the member presents the co-pay card at the pharmacy — when, as instructed by the defendant, the pharmacist electronically charges the health benefit provider the full benchmark price without accounting for the existence of co-pay subsidies. These transactions necessarily involve the use of the wires.

113.    Defendant makes additional misrepresentations via the mail and wires when defendant reports benchmark prices to reporting agencies while failing to account for the routine waiver of co-pays. These transactions necessarily involve the use of the mail and wires.

## VI.    CLASS ALLEGATIONS

114.    Plaintiff Plumbers brings this action pursuant to Federal Rule of Civil Procedure 23, on behalf of itself and a national class defined as:

> All entities in the United States and its territories that are at risk, pursuant to a contract, policy, or plan, to pay or reimburse all or part of the cost of a co-pay subsidy drug prescribed to natural persons covered by such contract, policy, or plan, and who paid for at least one prescription for Diovan and Diovan HCT that was subsidized by defendant's co-pay subsidy program.

115. The class period runs from when defendant started offering the Duionan/Diovan HCT co-pay subsidy programuntil defendant stops offering the program.. The precise period will be identified through discovery.

116. Excluded from the class are (i) defendant, defendant's legal representatives, officers, directors, assignees, predecessors, and successors, (ii) federal and state governmental entities administering prescription drug programs under Medicare, Medicaid, and or other federally or state-sponsored programs, and (iii) counsel for plaintiff and the class's self-funded health benefit plans (if any).

117. All class members have suffered, and will continue to suffer, harm and damages as a result of defendant's unlawful and wrongful conduct.

118. Defendant's co-pay subsidies are specifically targeted to undermine the cost-share provisions in those contracts.

119. Class members can be precisely determined from defendant's records, the records of the administrators of defendant's co-pay subsidy program, and pharmacy records. Members of the class themselves are unable to identify the subsidized prescriptions. However, defendant possesses information about the subsidized prescriptions, including the name and specific identifying information about each participating member and the pharmacy where the prescription was filled. The pharmacy has a record of both the amount of subsidy and the individual's health plan. The administrators also have this information, as well as the accumulated results of the program through all pharmacies. No uninjured parties will be included within the class because each member can be determined with specificity, based on actual transactional data.

120.    The fact of injury or damages to each class member can also be reasonably estimated from existing data. Aggregate damages to the class as a whole can reasonably be estimated from existing data, and commonly-used mechanisms by which to allocate that award among class members exist.

121.    The class consists of thousands of private health benefit providers. These providers are geographically dispersed throughout the United States. The disposition of all claims in a single action will substantially benefit all parties and the Court.

122.    Plaintiff Plumbers is the proposed class representative.

123.    The claims of Plumbers are typical of the claims of the class. Plumbers purchased drugs on behalf of its members whose cost-share obligations were subsidized by defendant. Plumbers, like all class members, paid for co-pay subsidy drug prescriptions as a result of defendant's subsidies. Plumbers will fairly and adequately protect the interests of the class. Plumbers has retained counsel with substantial experience prosecuting nationwide third party payor class actions. Plumbers and its counsel are committed to vigorously prosecuting this action on behalf of the class and have the financial resources necessary to do so.

124.    The factual and legal issues regarding defendant's alleged misconduct are common to all class members and represent a common thread of misconduct resulting in injury to Plumbers and the class. Common questions of law and fact include:

> a.   Whether defendant engaged in a course of conduct that improperly increased plaintiff's and other class members' drug costs;
>
> b.   Whether defendant engaged in a kickback scheme to increase plaintiff's and other class members' drug costs;

    c.  Whether defendant engaged in a pattern of deceptive and/or fraudulent activity intended to defraud plaintiff and other members of the class;

    d.  Whether defendant formed an enterprise for the purpose of effectuating its fraudulent scheme;

    e.  Whether defendant used the U.S. mails and interstate wire facilities and commerce to carry out this fraudulent scheme;

    f.  Whether defendant engaged in conduct that violated the federal racketeering laws as alleged herein;

    g.  Whether defendant engaged in conduct that violated federal antitrust laws as alleged herein;

    h.  Whether plaintiff and the other members of the class were injured by the conduct of defendant and, if so, the appropriate class-wide measure of damages; and

    i.  Whether plaintiff and the other members of the class are entitled to injunctive relief.

125.    Prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for defendant.

126.    Defendant has acted on grounds generally applicable to all class members in that defendant's anticompetitive and fraudulent actions uniformly impacted all class members. Accordingly, injunctive relief is necessary to protect all class members from further injury.

127.    Plaintiff knows of no difficulty that would prevent this case from being maintained as a class action. A class action is the superior method for fairly and efficiently

adjudicating this controversy. The cost of litigating a single action would prevent most class members from bringing suit individually. Class action treatment will, among other things, allow a large number of similarly situated entities to prosecute their common claims in a single forum, thus avoiding the unnecessary duplication of resources that numerous individual actions would require. Moreover, class action treatment allows injured payors, including smaller plans with limited means, to seek redress on claims that might be impracticable to pursue individually. Thus, absent a class action, there would be no remedy at law for thousands of injured entities. And absent a class action, there would be no mechanism for imposing uniform equitable injunctive relief to the class as a whole.

## VII.   CAUSES OF ACTION

### COUNT ONE
### SUBSTANTIVE RICO VIOLATION
### (18 U.S.C. § 1962(c))

128.   This Count alleges substantive violations of RICO (as provided in 18 U.S.C. § 1962(c)), relating to the co-pay subsidy program described above, and is asserted against defendant on behalf of plaintiff Plumbers and the class.

129.   COUNT ONE is asserted against defendant Novartis for the Diovan/Diovan HCT co-pay subsidy program. The Diovan/Diovan HCT co-pay subsidy enterprise is an association-in-fact comprised of defendant Novartis and unnamed co-conspirators PSKW and Emdeon. This enterprise is referred to collectively as the "co-pay subsidy enterprise." The drugs Diovan and Diovan HCT are referred to collectively as the "subsidized drugs."

130.   Plaintiff, members of the class, defendant, and the unnamed co-conspirators are all "persons" as defined by 18 U.S.C. § 1961(3).

**A.    Defendant and its co-conspirators formed an association-in-fact RICO enterprise.**

131.    For purposes of this claim, the RICO co-pay subsidy enterprise alleged herein is an association-in-fact within the meaning of 18 U.S.C. § 1961(4). Defendant and its co-conspirator administrators, including their directors, employees, and agents, formed an association-in-fact enterprise. This co-pay subsidy enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purpose of maximizing sales of subsidized drugs by unlawfully interfering with cost-sharing provisions.

132.    Within the co-pay subsidy enterprise there are contractual relationships, financial ties, and continuing coordination activities between defendant and its co-conspirator administrators.

133.    On information or belief, members of the co-pay subsidy enterprise have communicated repeatedly over the course of several years to carry out their common purposes, and have entered into, monitored, and enforced contractual and/or agency arrangements regarding payment and the delivery of services. Defendant hired the administrators to carry out the program.

**B.    The co-pay subsidy enterprise engaged in and affected interstate commerce.**

134.    The co-pay subsidy enterprise engaged in and affected interstate commerce because it involved thousands of transactions at hundreds of pharmacies all over the country and is attendant to defendant's marketing, distribution, and sale of the subsidized drugs across state boundaries and throughout the United States.

135.    During the class period, the illegal conduct and wrongful practices carried out by members of the co-pay subsidy enterprise (including defendant and the administrators) were effectuated by an array of employees, working across state boundaries, who necessarily relied

upon frequent transfers of documents and information, products, and funds through the U.S. mails and interstate wire facilities. In particular, administrators transmitted pharmacy data to defendant, and defendant transmitted funds to the administrators, who transmitted funds to the pharmacies.

**C. Defendant associated with its co-pay subsidy enterprise.**

136. The nature of the co-pay subsidy scheme required defendant to form and participate in an enterprise. Defendant hired its co-conspirator administrators and monitored and enforced this contractual arrangement regarding payment and the delivery of services. Each of these actions was necessary to, or helpful in, the co-pay subsidy enterprise's ability to carry out its goal of interfering with plaintiff and class members' cost-sharing provisions and causing plaintiff and class members to be charged an inflated reimbursement rate for subsidized prescriptions.

**D. The co-pay subsidy enterprise engaged in a pattern of racketeering activity.**

137. Defendant conducted and participated in the affairs of the co-pay subsidy enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

**1. The co-pay subsidy enterprise engaged in a scheme to defraud.**

138. The co-pay subsidy enterprise engaged in an intentional scheme to defraud plaintiff and the class by interfering with their cost-sharing provisions, causing them to pay for prescriptions of the subsidized drugs that they would not otherwise have paid for, and causing them to pay an inflated rate for each subsidized prescription. These transactions necessarily involve the use of the wires.

139. The co-pay subsidy enterprise engaged in an intentional scheme to defraud plaintiff and the class by causing misrepresentations to be made via the wires at the time of the

40

point of sale transaction — that is, when the member presents the co-pay card at the pharmacy — when when, as instructed by the defendant, the pharmacist electronically charges the health benefit provider the full benchmark price without accounting for the existence of co-pay subsidies. These transactions necessarily involve the use of the wires.

140. The co-pay subsidy enterprise engaged in an intentional scheme to defraud plaintiff and the class by reporting benchmark prices to reporting agencies while failing to account for the routine waiver of co-pays. These transactions necessarily involve the use of the mail and wires.

141. Defendant knew that entities like plaintiff and members of the class have cost-sharing programs to reduce the use of brand drugs by their plan members. The purpose and intent of defendant's co-pay subsidy scheme was to overcome such restrictions on brand drug purchases and to cause plaintiff and the class to pay for more prescriptions for the subsidized drugs at artificially inflated prices.

## 2. The co-pay subsidy enterprise used interstate communications systems to carry out this scheme.

142. The nature of this scheme necessarily required members of the co-pay subsidy enterprise to communicate directly and frequently by the U.S. mails and interstate wire facilities.

143. Many of the precise dates of the co-pay subsidy enterprise's uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to defendant's records. An essential part of the successful operation of the co-pay subsidy enterprise was defendant's ability to conceal the use of subsidies from Plumbers and the class at the point of sale.

144.   During the class period, defendant exerted control over the co-pay subsidy enterprise, and in violation of § 1962(c) of RICO, it conducted and participated in the conducts of the affairs of the co-pay subsidy enterprise, directly or indirectly, in the following ways:

      i.  Defendant conceived of and implemented the unlawful co-pay subsidy program;

      ii.  Defendant directly controlled the creation and distribution of marketing, sales, and other materials used to inform patients and physicians about the unlawful co-pay subsidy program;

      iii.  Defendant set the terms of the program, including eligibility criteria, amount of subsidy, and number of subsidies;

      iv.  Defendant caused administrators to administer the program without informing health benefit plans about the subsidies; and

      v.  Defendant instructed and caused pharmacies to charge health benefit plans an inflated reimbursement rate for subsidized prescriptions by instructing the pharmacy to process the co-pay card as though it were a form of secondary insurance.

145.   Defendant's pattern of racketeering likely involved tens of thousands of separate instances of use of the U.S. mails or interstate wire facilities to carry out the unlawful co-pay subsidies. Each of these fraudulent mailings and interstate wire transmissions and/or each transaction to charge health benefit plans an inflated reimbursement rate for subsidized prescriptions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). These violations constitute a "pattern" of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in which defendant intended to defraud Plumbers and members of the class.

E.     **The unlawful activity proximately injured plaintiff and the class.**

146.    Defendant's participation in the affairs of the co-pay subsidy enterprise, through a pattern of racketeering activity, has directly and proximately caused plaintiff Plumbers and members of the class to be injured in their business or property. Plaintiff Plumbers, members of the class, and others reasonably relied upon a belief that their members were paying their share of prescription drug costs (as determined by the cost-sharing provisions of their particular health plans) and that pharmacies were reporting and charging a reimbursement rate that accurately reflected the price defendant actually charged for the subsidized drugs.

147.    Defendant profited directly from the co-pay subsidy scheme in the form of increased sales of the subsidized drugs that plaintiff and the class would not otherwise have purchased but for defendant's interference with its cost-sharing programs. As a direct and proximate result of defendant's overt acts and/or predicate acts in furtherance of violating 18 U.S.C. § 1962(c), plaintiff Plumbers and the class have been and are continuing to be injured in their business or property.

148.    Plaintiff Plumbers and members of the class were injured in their property by reason of these violations because plaintiff and members of the class have paid for an increased number of prescriptions for the subsidized drugs as a result of the co-pay subsidy enterprise's substantive RICO violations. By reason of the unlawful acts engaged in by the co-pay subsidy enterprise, plaintiff Plumbers and the class have suffered ascertainable loss and damages. These injuries were directly and proximately caused by defendant's racketeering activity.

149.    Under § 1964(c) of RICO, defendant is liable to plaintiff Plumbers and members of the class for three times the damages sustained, plus the cost of bringing suit and reasonable attorneys' fees.

## COUNT TWO
## CONSPIRACY TO VIOLATE RICO
## (18 U.S.C. § 1962(d))

150. This Count alleges conspiracy to violate RICO (as provided in 18 U.S.C. § 1962(d)), relating to the co-pay subsidy program described above, and is asserted against defendant on behalf of plaintiff and the class.

151. COUNT TWO is asserted against defendant Novartis for the Diovan/Diovan HCT co-pay subsidy program. The Diovan/Diovan HCT co-pay subsidy enterprise is an association-in-fact comprised of defendant Novartis and unnamed co-conspirators PSKW and Emdeon. This enterprise is referred to as the "co-pay subsidy enterprise." The drugs Diovan and Diovan HCT are referred to collectively as the "subsidized drugs."

152. Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Defendant has violated Section 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this ongoing conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the co-pay subsidy enterprise through a pattern of racketeering activity.

153. Defendant adopted the goal of furthering or facilitating the criminal endeavor of the co-pay subsidy enterprise minimally by agreeing to facilitate some of the acts leading to the substantive offense, and directly by, as described above, engaging in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy.

154. Defendant not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but was aware that its ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

155. By hiring administrators to carry out the co-pay subsidy scheme, defendant engaged in overt acts in furtherance of the scheme as well as actual predicate violations of mail or wire fraud. As a direct and proximate result of defendant's overt acts and/or predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), plaintiff Plumbers and members of the class have been and are continuing to be injured in their business or property.

156. Plaintiff Plumbers and members of the class were injured in their property by reason of these violations in that plaintiff and members of the class have paid for an increased number of prescriptions for the subsidized drugs as a result of the co-pay subsidy enterprise's conspiracy to violate 18 U.S.C. § 1962(c).

157. By reason of the unlawful acts engaged in by the co-pay subsidy enterprise, plaintiff Plumbers and the class have suffered ascertainable loss and damages. These injuries were directly and proximately caused by defendant's racketeering activity.

158. By virtue of these violations of 18 U.S.C. § 1962(d), defendant is liable to plaintiff Plumbers and the class for three times the damages sustained, plus the cost of this suit and reasonable attorneys' fees.

**COUNT THREE**
**COMMERCIAL BRIBERY IN VIOLATION OF ROBINSON-PATMAN ACT**
**(15 U.S.C. § 13 (c))**

159. This Count alleges commercial bribery in violation of the Robinson-Patman Act (as provided in 15 U.S.C. § 13 (c)), relating to the co-pay subsidy program described above, and is asserted against Novartis on behalf of plaintiff Plumbers and the class.

160. COUNT THREE is asserted against defendant Novartis for the Diovan/Diovan HCT co-pay subsidy program.

45

161.    This program is referred to as the "co-pay subsidy program." The drugs Diovan

and Diovan HCT are referred to collectively as the "subsidized drugs."

162.    Section 2(c) of the Robinson-Patman Act prohibits the payments by drug

manufacturers to, or on behalf of, individual insureds to eliminate or reduce their personal

obligations under their prescription drug plans' cost-sharing plans. The relevant part of the

statute makes it unlawful for any person engaged in commerce to, in the course of such

commerce:

> (1) pay (or receive)-
>
> (a) anything of value as a commission, brokerage, or other
> compensation, or
>
> (b) anby allowance or discount in lieu of brokerage, *except* for
> services rendered in connection with a sale or purchase of goods,
>
> (2) when the payment is made to (or by)
>
> (a) the other party to the transaction, or
>
> (b) an agent, representative or other intermediary, where the
> intermediary is
>
> (i) acting for or in behalf of, or
>
> (ii) is subject to the direct or indirect control of
>
> (iii) any party to the transaction other than the person by whom the
> compensation is paid.

163.    Generally, these provisions of the Robinson-Patman Act bar commercial bribery,

*i.e.*, they prohibit a person from paying off fiduciaries, agents or other intermediaries who control

purchasing decisions to be paid for by another. Here, defendant is a "person" making payment

of something of value: defendant pays an individual insured to choose a subsidized drug that is

paid for by the individual's health benefit provider. Paying individuals who receive prescription

drug benefits pursuant to plans offered by private health benefit providers qualifies as a violation

of Section 2(c) of the Robinson-Patman Act because the subsidies are "anything of value" which are both (i) paid as "compensation" for purchasing the branded drugs, and (ii) as a "discount in lieu of brokerage."

164.    Individual insureds who accept rebates under defendant's co-pay subsidy program qualify as "agent[s], representative[s] [and] "other intermediar[ies]" because, pursuant to the terms of their agreements with their health benefit providers, they both (i) act on behalf of their health benefit providers in having substantial control in the choice of which medications will be paid for by the health benefit providers and, (ii) under the terms of the agreements with their health benefit providers, act subject to their health benefit providers' direct and indirect control in seeking payment for the selected medications through the terms of their plans. But members do not know these co-pay subsidies are bribes.

165.    Defendant offers these co-payment subsidies to privately-insured plan members in order to capture the large payments by private health benefit providers that accompany the relatively modest co-payments made by the individual members. By drastically reducing or eliminating the increased cost-sharing obligation, defendant increases sales of subsidized drugs to the detriment of health benefit plans. Health benefit providers (including Plumbers) invest a great deal of actuarial resources to provide incentives for their members to choose less expensive prescription drug therapy that works as well as pricier drugs. Defendant's co-pay subsidy program provides illegal inducements to members to choose more expensive drugs, to the detriment of prescription drug plans provided by Plumbers and members of the class.

166.    As a result, defendant's co-pay subsidy program results in injury to Plumbers and the class because the payments result in more purchases of subsidized drugs by plaintiff and the class than would have been made absent the illegal inducements.

47

## VIII.   DEMAND FOR JUDGMENT

167.   WHEREFORE, plaintiff Plumbers, on behalf of itself and the proposed class,

respectfully requests that the Court:

A.   Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the class, and declare plaintiff Plumbers the class representative;

B.   Enter judgment against defendant in favor of Plumbers and the class;

C.   Adjudge and decree the acts alleged herein to be unlawful;

D.   Award the class damages in an amount to be determined at trial;

E.   Award the class threefold damages pursuant to 18 U.S.C. § 1964(c) and 15 U.S.C. § 15(a);

F.   Award plaintiff and the class their costs of suit, including reasonable attorneys' fees as provided by law;

G.   Enjoin defendant from offering these or similar co-pay subsidy programs; and

H.   Grant such other further relief as is necessary to correct for the anticompetitive market effects caused by defendant's unlawful conduct as the Court deems just.

## IX.   JURY DEMAND

168.   Pursuant to Fed. Civ. P. 38, plaintiff, on behalf of itself and the proposed class,

demands a trial by jury on all issues so triable.

Dated: March 7, 2012                    Respectfully submitted,

s/ Lisa J. Rodriguez
s/ Nicole M. Acchione
Lisa. J. Rodriguez
Nicole M. Acchione
TRUJILLO RODRIGUEZ & RICHARDS, LLC
258 Kings Highway East
Haddonfield, NJ 08033
Tel. (856) 795-9002

48

Fax. (856) 795-9887
lisa@trrlaw.com

Steve W. Berman
Barbara M. Mahoney
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Ave., Suite 3300
Seattle, WA 98101
Tel. (206) 623-7292
Fax. (206) 623-0594
steve@hbsslaw.com
barbaram@hbsslaw.com

Thomas M. Sobol
Lauren Guth Barnes
Kristen Johnson Parker
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel. (617) 482-3700
Fax. (617) 482-3003
tom@hbsslaw.com
lauren@hbsslaw.com
kristenjp@hbsslaw.com

Kenneth A. Wexler
Bethany R. Turke
Dawn M. Goulet
Amy E. Keller
WEXLER WALLACE LLP
55 West Monroe St., Suite 3300
Chicago, IL 60603
Tel. (312) 346-2222
Fax (312) 346-0022
kaw@wexlerwallace.com
brt@wexlerwallace.com
dmg@wexlerwallace.com
aek@wexlerwallace.com

Jeffrey L. Kodroff
SPECTOR ROSEMAN KODROFF &
WILLIS PC
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel. (215) 496-0300
Fax. (215) 496-6611
jkodroff@srkw-law.com

*Counsel for Plumbers and Pipefitters Local 572*
*Health and Welfare Fund and the class*

49